FILED

2009 Jan-21  AM 11:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| WALNUT LAKE LAND | ] | |
| COMPANY, INC., et al, | ] | |
| | ] | |
| Plaintiffs, | ] | |
| | ] | |
| vs. | ] | 7:06-cv-00472-LSC |
| | ] | |
| PETRO STOPPING | ] | |
| CENTERS, LP, et al., | ] | |
| | ] | |
| Defendants. | ] | |

MEMORANDUM OF OPINION

I.     Introduction.

The Court has for consideration a motion for summary judgment, filed

by Petro Stopping Centers, LP, and Petro, Inc. ("Petro") on July 31, 2008.

(Doc. 59.)  Walnut Lake Land Company, Inc., L.T. Ward, Gene Walls, Bob

Barnett, Greg Collier, and Howard Garrett ("Walnut Lake"), along with

Deloris Smith, filed their Complaint in this Court on March 8, 2006.[1]  (Doc. 1.)

In their Complaint, Walnut Lake and Ms. Smith brought claims against Petro,

---

[1]Unlike the other named plaintiffs in this case, Deloris Smith is not a shareholder
in Walnut Lake Land Company.

Clark Ruby, and Enviro Management Company, Inc. ("EMC") for negligence, trespass, and nuisance.  Mr. Ruby was subsequently dismissed from this action, and summary judgment was granted in favor of EMC.  Petro has moved for summary judgment on Walnut Lake and Ms. Smith's remaining negligence, trespass, and nuisance claims.  The issues raised in the motion for summary judgment have been briefed by the parties and are now ripe for decision.  Upon full consideration of the legal arguments and evidence presented, Petro's motion will be granted as to all claims.

II.    Facts.[2]

Since 1989, Petro has owned and operated a retail truck stop on approximately 40 acres of land situated on the Jefferson and Tuscaloosa County line in Alabama.  As part of its operation, Petro maintains a retail store, a restaurant, fuel sales for both automobiles and commercial trucks, and showers and restrooms to be used by its customers.  Since its inception,

---

[2]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Petro has disposed of all sewage waste generated by its kitchen and restroom facilities through an onsite waste treatment system[3], pursuant to a permit issued by the Alabama Department of Environmental Management ("ADEM"). This system disposes of the partially treated waste either through dispersion onto a drip irrigation field (which is situated on Petro's property) or through a discharge point into Cooley Creek.

Walnut Lake owns property that adjoins the Petro property on its northeast corner. Situated on the Walnut Lake land is a lake, which is surrounded on two sides by several homes. The Petro property is situated, for the most part, at a higher elevation than the Walnut Lake property. Water flows into Walnut Lake through three (3) primary sources, the main one being Rockview Lake, which is situated on the northern side of Interstate 59/20. The other two (2) primary sources of water for Walnut Lake are drainage ditches that run parallel to Interstate 59/20 and which are situated on both the northeastern and southwestern sides of Walnut Lake. The water in Walnut Lake flows over a dam, and just below that dam it exits Walnut

---

[3]Petro now has tied into the sanitary sewer service and waste water is being discharged to the sewer. The onsite waste water system is not receiving waste at this time and will be closed.

Lake's property and forms a series of ponds that are situated on property owned by individuals who are not parties to this litigation.  After traveling through these series of ponds, it forms Cooley Creek.  Petro's permitted discharge point into Cooley Creek is located below this series of ponds and is not on property owned by any of the plaintiffs to this litigation.

With the exception of Deloris Smith, the individual plaintiffs, L.T. Ward, Gene Walls, Bob Barnett, Greg Collier, and Howard Garrett, are all shareholders in Walnut Lake Land Company, and in that capacity have leasehold interests in homes that are situated around Walnut Lake. Bob Barnett and Greg Collier are the only two full-time residents at Walnut Lake, whereas, L.T. Ward, Gene Walls, and Howard Garrett use their cabins for recreational purposes. Deloris Smith owned an unimproved piece of property measuring less than 10 acres that fronts the southwest portion of Petro's property and is situated downstream of Cooley Creek, below the permitted discharge point for the waste treatment system.  Ms. Smith sold this piece of property to Leopard Homes, LLC, after entering into a contract to do so in June 2005.  The sale of this property closed on February 13, 2006. The property sold for a total of $50,000.

The waste treatment system on Petro's property operates through a series of steps.  Raw sewage generated in its retail operation is deposited into an open air lagoon, known as an "aeration pond."  This pond has several motorized aerators that break down the solid waste which then settles to the bottom of the pond.  The waste undergoes further aerobic treatment by micro-organisms and after going through a series of "cells" within this pond, the partially-treated waste water flows through a pipe, by gravity, into a larger pond which is referred to as a "polishing pond."  Both the aeration pond and the polishing pond are lined with a heavy plastic liner and have been since the facility began operating in 1989.  The water is held in the polishing pond, where it undergoes more treatment by way of further settlement and natural ultraviolet exposure.  The partially-treated waste water is then pumped from the polishing pond either to the drip irrigation field, which is situated on Petro's property, or to the discharge point on Cooley Creek.  Under its ADEM permit, Petro is permitted to pump to the drip irrigation field twelve (12) months out of the year.  The claims asserted in this action do not relate in any way to the operation of Petro's drip irrigation field.  During the winter months, the ADEM permit allows Petro to discharge

directly into Cooley Creek.  After the water is pumped from the polishing pond, it flows through a UV treatment box, which is situated on Petro's property, and then flows down to the discharge point at Cooley Creek.

Under its ADEM permit, Petro is required to perform regular monthly monitoring of the waste water that is contained within its two (2) lagoons. Moreover, it is required to sample and monitor water from Cooley Creek in order to ensure compliance with ADEM requirements. EMC performed monthly water sampling, and the results of that monitoring are included in "Daily Monitoring Reports" ("DMRs"), which are then sent to ADEM on a regular basis.  The upstream sampling point utilized by EMC is actually on the northeast corner of Walnut Lake near Interstate 59/20, and the downstream monitoring point is just below the discharge pipe in Cooley Creek, but before Cooley Creek crosses under Highway 216 (thus, it is situated upstream from the property owned by Deloris Smith).

In or around 2000, Petro contracted with a third party to perform numerous repairs to the liner of the polishing pond.  At that time, the polishing pond was drained down very near its bottom and both small and large portions of the liner were replaced or repaired.  In or around 2002,

Petro contracted with Plastic Fusion Fabricators to replace the entire plastic liner of the aeration pond.

Prior to the time the repairs to the polishing pond liner were made, the residents of Walnut Lake alleged that there was a leak of either the polishing pond or the aeration pond coming out of the ground in an area situated lower in elevation than the top of the polishing pond.  The alleged leak was occurring in a spot on Petro's property some 40 feet from the northeast end of the polishing pond, halfway between the property line separating Petro's and Walnut Lake's property and 500 feet to the nearest point on Walnut Lake.  The land in between this point and the lake is undeveloped and heavily wooded.  The topography of the land in this area is such that surface water generally flows down towards Walnut Lake's property.  Approximately twenty (20) feet below the point at which the alleged leak was occurring is a rock berm that was put in place by Petro when the facility was constructed. It, too, is situated on Petro's property.

In response to this alleged leak, Petro and EMC constructed a "catch basin" for the liquid that was coming out of the ground.  A hole was dug and a bucket placed in the hole, and a sump pump was placed into the bucket.

The liquid that was coming out of the ground flowed into the bucket and was then pumped back up the hill and into the polishing pond.  The claim of a leak at that time was the subject of prior litigation, which was resolved between the parties to that litigation in or around 2000.

Following the installation of the catch basin, Dudley Dickerson, a principle in EMC, and his employees periodically observed the area where the catch basin was situated.  After the new plastic liner was installed in the aeration pond, they did not observe any further liquid flowing from the ground.  Their observations of this area ended after several months.

In or around March or April 2005, Plaintiff Greg Collier, after noticing an unusual taste in his mouth while swimming in Walnut Lake, took water samples and submitted them to the Jefferson County Department of Health. According to the Department, the samples contained an unusually high fecal coliform count.  Walnut Lake and Deloris Smith filed this lawsuit on or about March 8, 2006, with allegations of negligence, trespass, and nuisance, all of which are based on an allegation that one of the treatment lagoons is leaking at or from the same point as the alleged leak in 2000.

In November 2006, after the filing of this lawsuit, counsel for all parties and their experts were conducting an inspection of Petro's property, including the area where the alleged leak previously had occurred.  On this occasion, there was once again liquid flowing out of the ground, though with some disagreement between the parties as to the exact rate of flow.  Experts for both parties took samples of this liquid, as well as samples from Walnut Lake and the polishing pond located on Petro's property.  The samples from the water flowing out of the ground contained high bacterial counts consistent with that of waste water.  However, the samples that were pulled directly from Walnut Lake on that same date were found to be normal and without any evidence of contamination or constituents that might be associated with waste water.  According to the experts for both sides, the results of that testing were within normal limits for a pond of this type.

On the date that this flow was observed in November 2006, no party or its representative observed any flow of this liquid off of Petro's property and onto Walnut Lake's property.  The flow came out of the ground, and before reaching Walnut Lake's property it dissipated, either being absorbed back into the ground or evaporating.

All of the homes and cabins situated around Walnut Lake utilize septic tank systems.  Likewise, Rockview Lake, which supplies and is situated above Walnut Lake, has numerous homes on its banks which dispose of their waste through a septic tank system.  Walnut Lake is situated in a drainage basin and receives run-off from both north and south lanes on Interstate 59/20, as well as surrounding farming operations, which include cattle.  The surrounding area is rich with wildlife, including deer, ducks, geese, squirrels, raccoons, and possums.

Walnut Lake and Deloris Smith filed this lawsuit on or about March 8, 2006, with allegations of negligence, trespass, and nuisance, all of which are premised on the allegation that one of the treatment lagoons is leaking at or from the same point at which the alleged leak occurred in 2000.

III.    Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment "always bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp.*, 281 F.3d at 1224 (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.

1991)).

"[A]t the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986).  However, judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such character that it would warrant the jury finding a verdict in favor of that party." *Id.* at 251 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872)).  "This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250.

IV.    Discussion.

The complaint alleges negligence, wantonness, or willfulness; trespass; and nuisance under Alabama law.  Defendants contend that they are entitled to summary judgment on all of Plaintiffs' claims.  The Court addresses each claim below.

A.     Claims of Walnut Lake Plaintiffs.

i.     Negligence Claim.

Negligence "is the failure to do what a reasonably prudent person would have done under the same or similar circumstances, or the doing of something that a reasonably prudent person would not have done under the same or similar circumstances." *Ford Motor Co. v. Burdeshaw,* 661 So. 2d 236, 238 (Ala. 1995) (citing *Elba Wood Prods., Inc. v. Brackin*, 356 So. 2d 119 (Ala.1978)).  "[S]ummary judgment is rarely appropriate as to a claim alleging negligence," because these actions "almost always present factual issues of causation and of the standard of care that should have been exercised." *Nunnelee v. City of Decatur,* 643 So. 2d 543, 545 (Ala. 1993) (citing *Yarborough v. Springhill Mem'l Hosp.*, 545 So. 2d 32, 34 (Ala.1989)); *See also, Hunt v. Atrex, Inc.*, 963 So. 2d 122, 124 (Ala. Civ. App. 2007) (citations omitted).  Nevertheless, the Alabama Supreme Court has found summary judgment to be appropriate in various instances involving negligence claims where the evidence is clearly in favor of the movant.  *See, e.g., Hines v. Hardy*, 567 So. 2d 1283, 1285 (Ala. 1990); *Duffy v. Bel Air Corp.*, 481 So. 2d 872, 875 (Ala. 1985); *Bennett v. Cole*, 426 So. 2d 829, 831

(Ala. Civ. App. 1981), *aff'd Ex parte Bennett*, 426 So. 2d 832 (Ala. 1982);

*Shaw v. City of Lipscomb*, 380 So. 2d 812, 815 (Ala. 1980).

In order to recover under a negligence claim, the plaintiff bears the burden of proving (1) the existence of a duty owed by the defendant, (2) a breach of that duty, (3) proximate causation between the defendant's conduct and plaintiff's injury, and (4) damage or injury.  *See S.B. v. Saint James Sch.*, 959 So. 2d 72, 97 (Ala. 2006).  At the summary judgment stage, the Court will consider whether Defendants have demonstrated that there is no genuine issue of material fact left for consideration by a jury on a negligence claim.  *See Hunt*, 963 So. 2d at 124.

Walnut Lake contends that Petro is under a duty to reasonably operate, maintain, and repair the onsite waste disposal system.  Walnut Lake argues that Petro breached this duty, causing sewage and waste water to flow from the location observed in November 2006 onto its property and into its lake, reducing its value and interfering with its owners right to quiet and beneficial use of their property.  Petro, on the other hand, maintains that Walnut Lake has provided no evidence that would allow a jury to conclude that its

operation, maintenance, or repair of the waste treatment facility was performed in a negligent manner.

### a. Duty and Damages

Under the ADEM National Pollutant Discharge Elimination System ("NPDES") permit, Petro has a duty to prevent discharges of pollutants from sources not specifically identified in the permit.  This permit reads,

1. Duty to Comply
   a. The permittee must comply with all conditions of this permit.  Any permit noncompliance constitutes a violation of the AWPCA and the FWPCA and is grounds for enforcement action, for permit termination, revocation and reissuance, suspension, modification; or denial of a permit renewal application.
   b. ...
   c. The discharge of a pollutant from a source not specifically identified in the permit application for this permit and not specifically included in the description of an outfall in this permit is not authorized and shall constitute noncompliance with this permit. (Doc. 60-3, Ex. B at 25-26.)

Furthermore, even in the absence of a legal duty imposed by ADEM, Petro has a duty to employ a reasonable standard of care in the operation and maintenance of its sewage treatment system, ensuring to the extent practicable that it does not cause injury to its neighbors.  As to damages, it

is evident that if Walnut Lake could show a discharge of sewage into its lake, such a discharge could cause injury to that property.   Walnut Lake has arguably provided evidence of such damages by showing high levels of fecal coliform in tests taken of water from the lake.  While Walnut Lake has met its burden as to duty and damages, it must still show evidence that Petro has breached a duty and that this breach is the proximate cause of Walnut Lake's injury.

b.  Breach of Duty and Proximate Cause

Walnut Lake argues that Petro breached its duty by permitting its aeration or polishing pond to leak, thus allowing the flow observed by the parties in November 2006.  Under Alabama law, "direct evidence is not necessary to prove negligence on the part of a defendant" and "proof of negligence may be established completely through circumstantial evidence." *Kerns v. Sealy*, 496 F. Supp. 2d 1306, 1314 (S.D. Ala. 2007) (citations omitted).   Furthermore, logical inferences from the circumstances surrounding the alleged negligence are sufficient to meet the non-moving party's burden and raise a genuine issue of fact.  *See Marshall Durbin Co. v. Hartley*, 392 So. 2d 240, 241 (Ala. Civ. App. 1980) ("When a plaintiff brings

a suit and bases his right of recovery upon the negligence of another, he must show a state of facts from which the negligence charged may be reasonably inferred.")

Plaintiffs maintain that the outflow observed in 2006 is substantially the same as the earlier alleged leak at the heart of the previous dispute between the parties.  The earlier alleged leak ended soon after repairs to the polishing pond liner in 2000 and the installation of a new liner in Petro's aeration pond in 2002.  Plaintiff Barnett, who discovered the earlier alleged leak, testified that the current outflow is located at approximately the same location.  (Doc. 60, Ex. C at 34-37.)  Samples taken of this flow in November 2006 contained high bacterial counts consistent with a level found in waste water.   Taken together, these circumstances are sufficient to permit a reasonable jury to determine that Petro has a leak of either its aeration pond or polishing pond.

But even positing that a leak in one of Petro's treatment ponds exists and that such a leak represents a breach of Petro's duty, an assumption this Court will revisit below, Walnut Lake must still connect that leak to any supposed damage to its property.  While evidence is required, "a theory of

causation is not mere conjecture, when it is deducible as a reasonable inference from known facts or conditions.  If there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a judicial basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence."  *Dixon v. Bd. of Water & Sewer Comm'rs*, 865 So. 2d 1161, 1166 (Ala. 2003) (citations omitted).

Walnut Lake maintains that circumstantial evidence, taken as a whole, would allow a reasonable jury to reach the conclusion that the outflow from Petro's property resulted in the high fecal coliform count.  Walnut Lake's expert, Mr. Shaun Crawford, stated in his February 2007 opinion that he observed the "waste stream flow[ing] freely, bubbling up from the ground and running downslope toward the Petro truck stop property line and Walnut Lake at a rate estimated to up to 1 gallon per minute."  (Doc. 60, Ex. B at 9.) Mr. Crawford also testified that the rock berm in place on Petro's property was insufficient to stop the flow of water, and that "it might slow the water down, but rock berms don't filter contaminants."  (Crawford Dep., Doc. 60, Ex. A at 182-84.)  Furthermore, Mr. Barnett testified that he witnessed storm

run-off coming from "underneath the rock berm or through it" and into Walnut Lake, though he did not trace that water back to the location of the outflow.  (Crawford Dep., Doc. 60, Ex. C at 34-37.)  Mr. Crawford concludes in his report, despite having detected no fecal coliforms from his own samples of Walnut Lake, "[I]t is my unconditional opinion, based upon a reasonable degree of scientific certainty, that during a moderate rainfall event, fecal coliforms and associated viruses, bacteria and other pollutants of environmental concern could be readily transported from the Petro property onto neighboring properties and into Walnut Lake."  (Doc. 60, Ex. B at 10.)  The report further stated that pollutants had been conveyed from the Petro property "for months, if not years."  *Id.*

Petro's expert, Mr. Michael Corn, disputes these assertions.  He tested Walnut Lake for both fecal coliforms as well as nitrogen and phosphorous. Mr. Corn indicated that because the Petro site does not achieve nitrification, nitrogen and phosphorous could be used as effective tracers for waste water from the facility.  (Doc. 60, Ex. G at 8.)  Mr. Corn's test did not indicate a presence of either fecal coliforms or nitrogen and phosphorous, leading Mr.

Corn to conclude that the results "strongly suggest that there is no impact from the Petro Stopping Center wastewater treatment facilities." *Id.*

Furthermore, despite the claims in his report, Mr. Crawford testified that he was aware of no person that had witnessed a discharge from Petro's property onto either the property of the defendant or into Walnut Lake itself.  (Crawford Dep., Doc. 60, Ex. A at 82-83.)  He further stated that during his own observations of the flow, the liquid was reabsorbed into the ground before it reached the Walnut Lake property. *Id.* at 83-84.  Moreover, he conceded that the impact of any outflow would depend on "the amount of rainfall, whether or not there is a discharge of effluent off of Petro's property or on Petro's property, the amount of that discharge, the distance it has to travel, how long it's been exposed to UV light, temperature, [and] whether or not it's flowing through soil." *Id.* at 159.  These factors help to explain why Mr. Crawford's samples did not contain high levels of fecal coliform, as when he took his samples on December 11, 2006, no appreciable rainfall had occurred in the area since November 16, 2006.  (Doc. 60, Ex. B at 10.)

It is undisputed, however, that samples from Walnut Lake in March or April 2005 indicated unusually high bacterial counts.  Petro and its expert maintain that other sources caused the high bacterial counts of 2005, including surrounding wildlife, septic tank systems, and farming operations. It is apparent to this Court, however, that Walnut Lake has established a plausible theory of causation sufficient to survive summary judgment. Nevertheless, the Court also has serious concerns about the ability of Walnut Lake to convince a jury that the outflow on Petro's property, and not the numerous other sources listed above, caused the increase in fecal coliform in the lake.

Earlier in this opinion, the Court, for the purposes of discussing proximate causation, made certain assumptions regarding breach of duty. Namely, the Court posited that the alleged leak was the result of a breach of duty on Petro's part.  Despite showing a plausible theory of causation, Walnut Lake has failed to establish this critical component of a negligence claim.  While Petro may have a duty to maintain its treatment ponds, and while a leak may have developed in one of those ponds leading to the contamination of the lake and damages to plaintiffs, Walnut Lake has failed

to show any evidence that would allow a jury to determine that Petro's operation, maintenance, or repair of the waste treatment facility was performed in a manner that constituted a breach of its duty of care.

Rather than providing evidence of a breach of Petro's duty, Walnut Lake attempts to use logical inference to show that Petro's acts or omissions resulted in a leak from one its treatment ponds.  In doing so, Walnut Lake begins from the leak and work its way backwards, implying that if a leak exists then Petro must have breached its duty to reasonably maintain the waste disposal system.[4]  However, "the mere possibility that negligence caused an injury, without evidence, is not sufficient to support a verdict," and "negligence will not be inferred from mere showing of an accident and injury."  *Marshall Durbin Co.*, 392 So. 2d at 241; *Trapp v. Vess*, 847 So. 2d 304, 306 (Ala. 2002) (finding that the fact that the driver of an automobile

---

[4]It appears to the Court that Plaintiffs may be making a *res ipsa loquitur* argument.  However, Plaintiffs are not explicit in this regard, and this type of argument is not sufficient to show negligence in this matter.  *See George v. Ala. Power Co.*, 2008 Ala. LEXIS 228 (Ala. Oct. 31, 2008); *Ellis v. Alabama Power Co.*, 431 So. 2d 1242, 1245 (Ala. 1983) (stating that "[t]he law in Alabama is clear that an action which asserts liability for damages for the release of water will not lie in the absence of negligence"); *Avery v. Geneva County*, 567 So. 2d 282, 286 (Ala. 1990) (stating that one who impounds water owes a duty of reasonable care and is only liable if acting in a negligent manner).

lost control of the vehicle did not show a breach of that driver's duty of care); *McKinney v. Alabama Power Co.*, 414 So. 2d 938, 938-39 (Ala. 1982).

Without some evidence of breach of duty on Petro's part, it is axiomatic that proof of injury alone is insufficient to maintain a claim. *See Terrell v. Warehouse Groceries,* 364 So. 2d 675, 677 (Ala. 1978) (quoting *Greer v. Eye Foundation, Inc.*, 237 So. 2d 456, 459-60 (1970) for the proposition that the "mere fact of injury" does not raise a presumption of breach of duty). In an attempt to demonstrate a breach of Petro's duty, Walnut Lake points to two examples: Petro's failure to maintain the sump pump system, and Petro's failure to replace the liner of the polishing pond. Both of these examples are belied by the undisputed facts of this case. The sump pump system was not part of the sewage treatment system, but rather a stop-gap measure implemented during the period of the original alleged leak in 2000. After monitoring the location of that leak for several months after repairs were performed and the leak ceased and finding no re-emergence of the flow, the sump pump system was abandoned as it no longer served a purpose. As to the polishing pond, Walnut Lake's assertions appear to be factually misleading. While it is true that Petro did not replace the

liner of its polishing pond, the undisputed statement of facts indicates that the pond was drained and the liner repaired in 2000.  Even a theory that the repairs themselves were done in a negligent manner, an accusation that Walnut Lake does not make, is undermined by the subsequent cessation of the original alleged leak shortly following the work done to Petro's aeration and polishing ponds.

Therefore, since Walnut Lake has failed to establish evidence of a breach of Petro's duty, summary judgment is due to be granted as to the negligence claim.

ii.    Wantonness and Willfulness.

Wantonness is statutorily defined as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others."   Code of Ala. § 6-11-20(b)(3) (2008).   According to the Alabama Supreme Court, "wantonness" consists of "the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Alfa Mut. Ins. Co. v. Roush*, 723 So. 2d 1250, 1256 (Ala. 1998) (citing *Bozeman v. Cent. Bank of the South*, 646 So. 2d 601 (Ala.1994)).  In order to

make out a claim for wantonness, "it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff." *Alfa Mut. Ins. Co.*, 723 So. 2d at 1256.  Willful and wanton conduct, however, "requires some degree of consciousness on the part of the defendant that injury is likely to result from his act or omission, [and] is not to be confused with negligence." *Phillips v. United Servs. Auto. Ass'n*, 988 So. 2d 464, 467 (Ala. 2008) (citations omitted).

In this case, there is no evidence that Petro acted with "reckless or conscious disregard of the rights or safety of others."  Rather, the evidence indicates that Petro had replaced and repaired the liners of its treatment ponds with an intent to prevent any leaks.  Walnut Lake has not countered these actions with evidence to show reckless conduct or a conscious disregard of the safety of the property owners.  Thus, Petro's motion for summary judgment is due to be granted as to the claim of wantonness and willfulness.

      iii.    Trespass.

Alabama recognizes two types of trespass: direct and indirect. Walnut Lake argues that Petro is liable for an indirect trespass.  In order to prove an

indirect trespass, the plaintiff must satisfy four elements: (1) an invasion affecting an interest in the exclusive possession of his property; (2) an intentional doing of the act which results in the invasion; (3) reasonable foreseeability that the act done could result in an invasion of the plaintiff's possessory interest; and (4) substantial damage to the res.  *See*, *Borland v. Sanders Lead Co.*, 369 So. 2d 523, 529 (Ala. 1979).  In Alabama, "[t]respass requires an intentional act by the defendant."  *Russell Corp. v. Sullivan*, 790 So. 2d 940, 945 (Ala. 2001); *Born v. Exxon Corp.*, 388 So. 2d 933, 934 (Ala. 1980) ("[I]n order for one to be liable to another for trespass, the person must intentionally enter upon land in the possession of another or the person must intentionally cause some "substance" or "thing" to enter upon another's land.").

Walnut Lake has not shown the type of intentionality and foreseeability necessary to support trespass.  In *Rushing v. Hooper-McDonald, Inc.*, the Court found an indirect trespass when the defendant emptied asphalt so that it ran downhill and into a waterway, polluting it.  293 Ala. 56, 58 (Ala. 1974). The Court noted that an indirect trespass could be pursued if the act leading to that trespass is "done so that it will to a substantial certainty result in the

entry of the asphalt or foreign matter onto the real property that the plaintiff possesses." *Rushing*, 293 Ala. at 60.  It is clear in this case, however, that Petro acted in a manner designed to prevent this very type of activity.  It operated its treatment ponds under ADEM supervision, and replaced and repaired the liners of those ponds in an effort to prevent any leaks.  While the presence of a leak may represent a violation of its NPDES permit, it is clear that Petro was not guilty of intentional actions that it should have known would lead to an invasion of Walnut Lake's property. Thus, Petro's motion for summary judgment is due to be granted as to the claim of trespass.

       iv.   Nuisance.

Nuisance consists of "anything that works hurt, inconvenience or damage to another."  Code of Ala., § 6-5-120 (2008).  The scope of nuisance is broad, and includes "conduct that is intentional, unintentional, or negligent." *Tipler v. McKenzie Tank Lines*, 547 So. 2d 438, 440 (Ala. 1989). Nuisance has been "liberally interpreted to effect its broadly stated purpose." *Id.* at 440.  At its heart, "[t]he gravamen of a claim of public or private nuisance or trespass is that there has been an intrusion which

interferes with a landowner's use of the property." *E S Robbins Corp. v. Eastman Chem. Co.*, 912 F. Supp. 1476, 1494 (N.D. Ala. 1995). Moreover, "it may even consist of activities that are conducted in an otherwise lawful and careful manner . . . so long as it works hurt, inconvenience, or damage to the complaining party." *Tipler*, 547 So. 2d at 440. While nuisance has been liberally construed, "[t]his does not mean, however, that the plaintiff is not required to prove against the defendant the elements of legal duty and causal relation between the conduct or activity complained of and the hurt, inconvenience, or damage sued for." *Tipler*, 547 So. 2d at 440. In explaining this standard, the Alabama Supreme Court has "clearly implied that the duty and causation analyses in a nuisance claim are conducted the same way as they are in a negligence claim." *Radcliff v. Tate & Lyle Sucralose, Inc.*, 2008 U.S. Dist. LEXIS 62559 *16 (S.D. Ala. Aug. 14, 2008); *E S Robbins Corp.*, 912 F. Supp. at 1494 ("Further, the elements of legal duty and causation between the conduct or activity complained of and the hurt, inconvenience, or damage sued for, must be met in order to establish a statutory nuisance claim in Alabama.") (citing *Tipler*, 547 So. 2d at 440). In *Hilliard v. Huntsville Electric Utility Board*, the Alabama Supreme Court held, "[F]or an

action in nuisance under § 6-5-120, Ala. Code, 1975, the plaintiff must show conduct, be it intentional, unintentional, or negligent, on the defendant's part, which was a breach of legal duty, and which factually and proximately caused the complained-of-hurt, inconvenience or damage." 599 So. 2d 1108, 1113 (Ala. 1992); *see also, LaBauve v. Olin Corp.*, 231 F.R.D. 632, 673 (S.D. Ala. 2005) (citing *Tipler* and laying out a four part test for nuisance claims).

Because of the breach of duty and proximate cause commonality, when Alabama courts have found sufficient evidence of negligence to overcome summary judgment, they have also allowed nuisance claims to proceed as well.[5] *See Radcliff,* 2008 U.S. Dist. LEXIS 62559 at *18; *Hilliard v. Huntsville Elec. Util. Bd.*, 599 So. 2d 1108, 1112-13 (Ala. 1992).

As the Court noted above in analyzing Walnut Lake's negligence claim, there is sufficient evidence of proximate causation to overcome summary judgment, but Walnut Lake has failed to show a breach of duty.  Thus,

---

[5]The Court finds the § 822 of the Restatement of Torts helpful in understanding the interplay between negligence and nuisance.

Petro's motion for summary judgment is due to be granted as to the claim of nuisance.[6]

B.  Claims of Deloris Smith.

While the claims of Ms. Smith are predicated on the same alleged violations as those of Walnut Lake, the factual situation surrounding her claims is significantly different.  As explained above, Ms. Smith's property is situated downstream of Cooley Creek, below the permitted discharge point for the waste treatment system.  Her property is not located on Walnut Lake, and Ms. Smith sold her property to Leopard Home Builders, LLC on February 13, 2006, for $50,000.  Furthermore, while Plaintiff's expert, Mr. Crawford, visited the site of the alleged leak and Walnut Lake's property, his knowledge of Ms. Smith's property is far more limited.  He testified that he never spoke with her, did not know where her property was located, and could offer no direct opinion on the affect of any leaks on her property.  (Crawford Dep., Doc. 60, Ex. A at 78-80.)  Furthermore, Ms. Smith testified that she had never

---

[6]While failure to show a breach of duty is fatal to the nuisance claim in the instant matter, the Court does not mean to imply that all nuisance claims would fail absent a breach of duty.  Intentional and unreasonable conduct, or conduct consisting of abnormally dangerous conditions or activities, for instance, would not necessarily require a breach of duty in order to constitute a nuisance.

observed any condition on the property that she could link to leaks from Petro's waste treatment process.  (Smith Dep., Doc. 60, Ex. H at 46-49.)

Ms. Smith appears to base her claims on part of Mr. Crawford's expert opinion reiterating that water from Walnut Lake will eventually flow down into Cooley Creek, possibly affecting property downstream.  (Doc. 60, Ex. B at 5-6.)  This type of speculation, however, is not sufficient to overcome a motion for summary judgment.  In *Russell Corp.,* the court cautioned against relying on expert opinions based in speculation rather than testing and studies of the land allegedly affected, stating, "[I]n an action alleging contamination of soil and water, the failure of experts to conduct studies on the plaintiffs' properties [is] fatal."  790 So. 2d at 949.  Ms. Smith has provided no evidence beyond speculation to show that her property was affected by the alleged leak on Petro's property.  While this Court is willing to accept the inferential claims made by Walnut Lake and predicated on tests made by Mr. Crawford and others regarding the possible pollution of Walnut Lake, building on that inference to speculate that contaminated water would then travel downstream and pollute Ms. Smith's property without supporting evidence is impermissible.  It is a well established principle of Alabama law,

"An inference cannot be derived from another inference.  An inference must be based on a known or proven fact."  *Russell Corp.*, 790 So. 2d at 950 (quoting *Kmart Corp. v. Bassett*, 769 So. 2d 282, 287 (Ala. 2000)).  *See also, Johnson v. Louisville & N.R.R.*, 240 Ala. 219, 225, 198 So. 350, 354-55 (1940) (stating that "it is well settled that it is not permissible to build inference upon inference which leads to pure conjecture or guess").  Finally, Ms. Smith has presented no evidence indicating that the value she received for her property was in any way diminished by Petro's alleged negligence.  (Smith Dep., Doc. 60, Ex. H at 46-49.)  Therefore, Petro's motion for summary judgment is due to be granted as to the claims of Ms. Smith.

V.     Conclusion.

For the reasons stated above, Petro's motion for summary judgment will be granted in all respects.  A separate order will be entered.

Done this 21st day of January 2009.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
153671